IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| 4505 MADISON LLC, ) | |
| ) | |
| and ) | |
| ) | |
| FISHER LAW LLC, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| THE TRAVELERS INDEMNITY ) | |
| COMPANY OF AMERICA, ) | **JURY TRIAL DEMANDED** |
| ) | |
| Defendant. ) | |

## CLASS ACTION COMPLAINT

In the wake of the COVID-19 pandemic, virtually every major insurer has reimbursed automotive policyholders a portion of their premiums due to policyholders' lower driving rate during the crisis. One major insurance CEO succinctly stated, "[W]e believe [our customers] overpaid in their premiums. It's our duty to return that premium, because it belongs to them."[1] Yet insurers have not reimbursed *businesses* for premiums related to their general commercial liability, even though businesses have largely been closed and/or significantly curtailed in their availability to the public.

This lawsuit seeks to remedy that disparity and seeks damages and other relief on behalf of businesses who were overcharged premiums during the COVID-19 pandemic. In support of its Complaint, Plaintiffs respectfully submit the following:

---

[1] Car Insurance Companies Giving Customers Partial Refunds during Pandemic (April 15, 2020) (available at https://www.caranddriver.com/news/a32071984/car-insurance-price-cuts-coronavirus/) (last accessed May 13, 2020).

1

**PARTIES**

1.      Plaintiffs 4505 Madison LLC and Fisher Law LLC (collectively Plaintiffs) are Missouri businesses that own and operate a mixed-use office building in Kansas City, Jackson County, Missouri.

2.      Defendant Travelers Indemnity Company of American (Travelers) is an insurance company licensed to do business in Missouri. Travelers is authorized to write, sell, and issue insurance policies providing property and casualty coverage in exchange for a premium to businesses nationwide including in Missouri. Travelers may be served with process via the Director of the Missouri Department of Insurance in accordance with Mo. Rev. Stat. § 375.906 at the Director's location in Cole County, Missouri.

**JURISDICTION AND VENUE**

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiffs and Travelers are citizens of different states and the amount in controversy is believed to exceed $75,000 exclusive of interest and costs. In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because this lawsuit was filed as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, the matter in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, the class consists of at least 100 members, Plaintiffs and Travelers are citizens of different states, and no exception applies.

4.      Venue is proper in this district under 28 U.S.C. § 1391 because Plaintiffs reside in this district and because a substantial portion of the acts and conduct giving rise to the claims occurred in this district.

5.      Venue in this division is proper under Local Rule 3.2 because Plaintiffs personally served Travelers within this division in accordance with Missouri law, and/or (2) Travelers is

2

Case 4:20-cv-00590-FJG   Document 1   Filed 07/27/20   Page 2 of 18

subject to specific jurisdiction within this division because it has continuous contacts with this division related to the policy at issue by virtue of registering the policy with the Department of Insurance and selling the policy to members of the proposed class throughout the division.

## FACTUAL ALLEGATIONS

6. Plaintiffs operate a mixed use office building situated at 4505 Madison; Kansas City, Missouri 64111. Plaintiffs' office building houses several law firms, and a medical spa that serves the general public.

7. Travelers issued Policy No. 680-8M563798-18-42 to Plaintiffs, which is attached hereto as Exhibit A (the Policy).

8. Like thousands of other businesses across the United States, Plaintiffs' operations have been and continue to be disrupted by government restrictions related to the novel coronavirus, SARS-CoV-2, which causes the infectious disease COVID-19.

9. COVID-19 first appeared in late 2019. It is a highly contagious virus that has rapidly spread and continues to spread across the globe. It can cause severe respiratory distress and even death.

10. COVID-19 is spread by a number of methods, including "community spread," meaning that some people have been infected and it is not known how or where they became exposed. Public health authorities, including the CDC, have reported significant ongoing community spread of the virus including instances of community spread in all 50 states.

11. The CDC has reported that a person can be become infected with COVID-19 by touching a surface or object (like a fork, plate, table, or chair) that has the virus on it, and then touching their own mouth, nose or eyes.

12. COVID-19 has been declared a pandemic by the World Health Organization.

13. The COVID-19 pandemic is a public health crisis that has profoundly impacted American society, including the public's ability to patronize restaurants, bars and retail stores.

14. Many state and local governments have issued Stay at Home orders to slow the spread of COVID-19, thereby limiting public activities and the activities of businesses. These Stay at Home Orders have caused the suspension of non-essential and essential businesses, including Plaintiff's.

15. Because of the stay-at-home orders, normal business and consumer activity has been severely disrupted. For example, insurance industry experts estimate that business closure losses just for small businesses with 100 or fewer employees has increased to $255 billion to $431 billion *per month*.[2]

16. Similarly, drivers are driving significantly less than before COVID-19; industry experts estimate that vehicle miles traveled has fallen by over 50% during the pandemic.[3]

*Automotive Policyholders Find Relief*

17. In response to the dramatic decline in vehicle miles traveled, consumer groups called on insurers to return portions of automobile policy premiums; these groups included the Center for Economic Justice (CEJ) and the Consumer Federation of America (CFA).

18. In a joint letter dated March 18, 2020, the groups called on state insurance commissioners to consider premium offset payments to automotive policyholders "whose miles

---

[2] APCIA Releases New Business Interruption Analysis (April 6, 2020) (available at http://www.pciaa.net/pciwebsite/cms/content/viewpage?sitePageId=60052) (last accessed May 13, 2020)

[3] New Car Accident Data Show That Most Auto Insurance COVID-19 Refunds Should Be Twice As Much as Promised to Date (May 7, 2020) (available at https://consumerfed.org/press_release/new-car-accident-data-show-that-most-auto-insurance-covid-19-refunds-should-be-twice-as-much-as-promised-to-date/) (last accessed May 13, 2020).

4

driven has declined and will continue to remain lower than anticipated at the time of policy rating . . ."[4]

19. The insurance industry responded and began issuing premium returns to its automotive policyholders.

20. As of April 13, 2020, insurance companies that collectively occupy nearly 90% of the market share have returned or plan to return over $6.5 billion in automotive premiums to policyholders.[5]

21. Because all insurers use some form of miles driven to determine rates, the responses to COVID-19 "will result in savings to the system that can be quantified and returned to American consumers." *See* FN2, *supra*.

22. Put another way, one CEO acknowledged that customers "over paid in their premiums" and it is "our duty to return that premium, because it belongs to them." *See* FN1, *supra*.

23. In statements to regulators, companies have acknowledged the windfall and stated that emergency orders in response to COVID-19 "have temporarily but significantly reduced expected costs . . ."

24. Thus, when faced with evidence of a change in insurable conduct and recognizing the windfall that insurance companies may receive, insurance companies are returning premiums to automotive policyholders.

---

[4] *See* CEJ and CFA letter (March 18, 2020) (available at https://consumerfed.org/wp-content/uploads/2020/03/COVID-19-Auto-Premium-Relief-Letter.pdf) (las accessed May 13, 2020).

[5] *See* Report Card to Date on the $6.5 Billion+ Promised To Auto Insurance Customers, Table 1 (April 13, 2020) (available at https://consumerfed.org/press_release/report-card-to-date-on-the-6-5-billion-promised-to-auto-insurance-customers-as-people-drive-less-due-to-covid-19/) (last accessed May 13, 2020).

### *Businesses Find No Relief*

25. Despite a comparable drop in insurable conduct, insurers have not offered any sort of premium relief to businesses, even though they also have experienced a substantial reduction in business and exposure due to COVID-19.

26. Thus, while insurers offer billions of dollars in insurance premium relief to automotive policyholders, they are offering no premium relief to businesses that are experiencing a similar reduction in exposure.

27. Recognizing this inconsistency, the CEJ and CFA weighed in. In a letter dated March 30, 2020, the two groups cautioned:

> Personal auto insurance is not the only type of insurance experiencing a dramatic reduction in exposure. Businesses whose premium is based on employee count or measures of serving the public such as receipts and who have been forced to close ***are also experiencing radical reductions in exposure***—changing the exposure basis used when the policies were originally written.[6]

28. Similarly, the Alaska Department of Commerce warned that for many property and casualty insurance policyholders, "initial estimates [for exposure] are expected to be much higher than the exposure actually realized."[7]

29. Thus, consumer watchdogs and regulators recognize that business policyholders will incur exposure at a rate far less than their premiums contemplated, meaning they overpaid for their premiums.

---

[6] *See* CEJ and CFA letter (March 30, 2020) (available at https://consumerfed.org/wp-content/uploads/2020/03/COVID-19-Auto-Premium-Relief-Letter-3-30-20.pdf) (last accessed May 13, 2020) (emphasis added).

[7] Alaska Department of Commerce, Bulletin B 20-10 (March 20, 2020) (available at https://www.commerce.alaska.gov/web/Portals/11/Pub/INS_B20-10.pdf) (last accessed May 13, 2020).

*Plaintiffs' Experience*

30. Like automotive policyholders, as a result of the widespread stay-at-home orders, Plaintiffs' operations experienced a "radical reduction" in exposure to potential claims under the Policy, as evidenced by reduced hours of operation, reduced accessibility of the building, and limited operation during the effective period for the stay-at-home orders.

31. For example, Plaintiffs' building and its tenants were closed to the public beginning in mid-March 2020.

32. The closure resulted in a loss of revenue to some of Plaintiffs' tenants, as well as a reduction in public accessibility.

33. This level of activity is a marked departure from previous months.

34. Because Plaintiffs experienced a significantly lower exposure rate due to COVID-19, Plaintiffs overpaid premiums to Travelers for the commercial general liability policy.

35. Plaintiffs' policy constitutes a commercial policy under the applicable insurance laws because it is insurance for a business that "is not for personal, family or household purposes, and which is provided by issuance of a policy of insurance and not merely a binder for such insurance coverage."

36. Commercial policies are unregulated lines of insurance because any regulatory filing is submitted "for informational purposes only" and the rates therein "are not to be reviewed or approved by the department of commerce and insurance as a condition of their use."

37. In this case, Plaintiffs paid a "provisional premium" with the expectation that the premiums would be subject to adjustment later after Travelers conducted a "Premium Audit."

38. Section I(5) of the Policy governs Premium Audits and states:

a. We will compute all premiums for this [Commercial General Liability] Part in accordance with our rules and rates.

b. Premium shown in this [Commercial General Liability] Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

39. Thus, the Policy gives rise to Plaintiffs' claims under three bases: (1) the Policy is fluid and subject to change based on the change of circumstances, and Travelers reserves its right to charge additional premiums based on those changed circumstances in accordance with its rules and rates; (2) Travelers has an obligation to audit the Policy and return any unearned premiums based on changed circumstances; and (3) Travelers must return any Premium Credit owed to policyholders. As alleged herein, these provisions give rise to Plaintiffs' claims.

40. Travelers has not fulfilled any of these obligations for Plaintiffs or the Class: it has not re-evaluated the appropriate premiums on its commercial general liability policies in light of COVID-19; it has not conducted any audits in response to COVID-19; and it has not returned any Premium Credit to policyholders.

41. Travelers evaluated the exposure of Plaintiffs for a twelve (12) month policy period, but it did not consider the shutdown due to COVID-19, and it did not invoke any of the above three

provisions for the benefit of Plaintiffs or the Class.

42. As a result of the COVID-19 pandemic, Plaintiffs' current exposure is a dramatic departure from Plaintiffs' exposure when it purchased its general commercial liability policy from Defendant, and materially changed the underwriting guidelines applicable to Plaintiffs.

43. For example, underwriters consider square footage, payroll, gross sales, and other factors in establishing premium amounts for commercial general liability policies—the limitations mandated by the COVID-19 pandemic have impacted each of these categories to the benefit of Defendant and other insurance companies.

44. In this respect, Plaintiffs overpaid their premiums to State Farm because its exposure was significantly reduced due to COVID-19.

45. Defendant had and currently has the ability to perform audits and monitor to reduce premiums, and by retaining such premium monies when Defendant is aware of the dramatic downturn in business due to COVID-19, Defendant owes Plaintiffs and the Class interest.

46. In this lawsuit, Plaintiffs do not seek damages related to any claim for business interruption coverage.

## CLASS ACTION ALLEGATIONS

47. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

48. Plaintiffs brings this class action and seeks certification of the claims on behalf of the following Class:

> **All persons and entities that: (a) purchased commercial liability insurance with Travelers; (b) paid a premium for the coverage based on Travelers' rates and rules; and (c) were subject to a Stay at Home Order.**

49. Plaintiffs reserve the right to amend the Class definition if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

50. Excluded from the Class are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, unnamed co-conspirators, successors, subsidiaries, and assigns.

51. This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

52. **Numerosity – Rule 23(a)(1).** Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this time, but in 2019 Travelers was ranked #1 in the "Top 10 Writers of Commercial Lines Insurance by Direct Premiums" with approximately 5.5% of the market share and over $18 billion in direct premiums written.[8] Accordingly, Plaintiffs and the Class satisfy the numerosity requirement of Rule 23. Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

53. **Existence and Predominance of Common Questions of Law and Fact – Rule 23(a)(2), 23(b)(3).** Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

   a. Whether Defendant calculated premiums based on factors common to the Class;

   b. Whether the presence of those factors were materially affected or diminished due to the COVID-19 pandemic;

   c. Whether, in light of the COVID-19 pandemic, Plaintiffs and Class members overpaid their premiums for general commercial liability;

---

[8] *See* Insurance Information Institute, Facts + Statistics: Commercial Lines (available at https://www.iii.org/fact-statistic/facts-statistics-commercial-lines).

d. Whether Defendant's retention of those overpaid premiums constitutes a wrongful financial windfall;

e. Whether Travelers violated its obligations and duties under the Policy;

f. Whether the case may be maintained as a class action under Fed. R. Civ. P. 23;

g. Whether and to what extent Class members are entitled to damages and other monetary relief;

h. Whether and to what extent Class members are entitled to equitable relief, including restitution, rescission, a preliminary and/or a permanent injunction; and

i. Whether and to what extent Class members are entitled to attorneys' fees and costs.

54. **Typicality – Rule 23(a)(3).** Plaintiffs' claims are typical of the claims of the Class because, like Class members, it paid premiums for its general commercial liability to Defendant. In this respect, Plaintiffs' claims are typical of the claims of the members of the Class as the claims arise from the same course of conduct by Defendant, and the relief sought within the Class is common to the members of each.

55. **Adequacy of Representation – Rule 23(a)(4).** Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. Plaintiffs do not have any interests that are adverse or antagonistic to those of the Class.

56. **Superiority – Rule 23(b)(3).** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for the Class members, on an individual basis, to obtain

11

effective redress for the wrongs done them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

57. Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant;

b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate.

## COUNT ONE
## Breach of Contract
### (Brought by Plaintiffs and the Class Against Defendant)

58. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

59. Plaintiffs and the Class entered insurance contracts with Travelers.

60. Under the insurance contracts, Travelers agreed to provide liability coverage for the policy period in exchange for a premium.

61. Travelers used its rules and rates to determine Plaintiffs' and the Class members' exposure to calculate premiums.

62. Travelers calculated premiums as if Plaintiffs and the Class would have been open to the public for the full policy period.

63. Plaintiffs and the Class met their obligations and have paid their premiums.

64. In reality, Plaintiffs and the Class have not been operating for the full policy period and their exposure is much less than Travelers has calculated.

65. Defendant breached the contract because it did not conduct a premium audit as a result of COVID-19. Defendant should have, and likely did, appreciate and understand that the COVID-19 protocols, including mandatory stay-at-home orders, would decrease the risk of claims in Plaintiffs' commercial liability insurance policy.

66. Defendant also breached the contract because it did not monitor and issue a premium credit due to the impact of COVID-19.

67. If Defendant factored in the shutdown and COVID-19 when it applied its rules and rates, then Plaintiffs and the Class would pay less in premiums.

68. Plaintiffs and the Class have overpaid their premiums because Defendant did not properly apply its rules and rates.

69. Defendant breached its contract by not properly applying its rules and rates to calculate Plaintiffs' and the Class members' premiums.

70. As a result of Defendant's breach, Plaintiffs and the Class have sustained substantial damages for which Travelers is liable in an amount to be established at trial.

## COUNT TWO
### Breach of Duty of Good Faith and Fair Dealing
### (Brought by Plaintiffs and the Class Against Defendant)

71. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

72. The Policy between Plaintiffs and Defendant constitutes a binding and enforceable contract.

73. Under Missouri law, a covenant of good faith and fair dealing is implied in every contract.

74. Defendant drafted terms within the contract that gave it discretion on how to charge premiums and the amount of premiums to charge.

75. Defendant has discretionary power that affects the rights of Plaintiffs, including determining premiums. Defendant has a duty to exercise this discretion with good faith.

76. Defendant has made no effort to return overpayments of premiums to Plaintiffs and the Class despite its knowledge that Plaintiffs and the Class overpaid their premiums due to COVID-19.

77. The failure to return premium overpayments is a breach of the covenant of good faith and fair dealing that evades the spirit of the agreement and denies Plaintiffs and the Class the expected benefit of the Policy.

78. Defendant violated its duty of good faith and fair dealing when it failed to conduct a premium audit after the unprecedented and extreme economic changes and regulations implemented due to the COVID-19 pandemic including mandatory stay-at-home orders.

79. Even if Defendant were not required to conduct a premium audit via the explicit Policy language and did not breach the contract, which Plaintiffs disagree with, Defendant's

failure to conduct a premium audit considering the extreme and unprecedented implications of COVID-19 was a breach of the covenant of good faith and fair dealing.

80. Defendant's breach deprived Plaintiffs of the benefit of the bargain.

81. Defendant's conduct denied Plaintiffs the expected benefit of the Policy of the calculation of premiums commensurate with the level of insurance risk of Plaintiffs' business.

82. Plaintiffs and the Class were damaged by Defendant's breach of good faith and fair dealing.

83. Plaintiffs' claim of good faith and fair dealing is distinct and independent from its breach of contract claim.

84. As a result of Defendant's breach, Plaintiffs and the Class have sustained substantial damages for which Defendant is liable in an amount to be established at trial.

**COUNT THREE**
**Unjust Enrichment**
**(Brought by Plaintiffs and the Class Against Defendant)**

85. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

86. Defendant wrongfully obtained monies in the form of overpaid premiums from Plaintiffs and the Class.

87. Defendant appreciated, accepted and retained the benefits of overpaid and inequitable premiums from Plaintiffs and the Class in the form of profits.

88. It would be inequitable and unjust for Defendant to retain these wrongfully obtained profits.

89. Defendant's retention of these wrongfully-obtained profits would violate the fundamental principles of justice, equity, and good conscience.

90. Plaintiffs and the Class are entitled to restitution of the profits unjustly obtained, plus interest.

91. Plaintiffs and the Class plead this unjust enrichment claim in the alternative.

## COUNT FOUR
## Money Had and Received
### (Brought by Plaintiffs and the Class Against Defendant)

92. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

93. Through virtue of the overpaid premiums outlined herein, Defendant received or obtained possession of money belonging to Plaintiffs and the Class.

94. Defendant appreciated a benefit of the money in its possession belonging to Plaintiffs and the Class.

95. Defendant's acceptance and retention of the money was unjust.

96. Plaintiffs and the Class plead this money had and received claim in the alternative.

## COUNT FIVE
## Declaratory and Injunctive Relief
### (Brought by Plaintiffs and the Class Against Defendant)

97. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

98. The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

99. An actual controversy has arisen and now exists between Plaintiffs and the Class, on the one hand, and Defendant, on the other hand, concerning the respective rights and duties of the parties under the Policy.

100. Plaintiffs do not have another adequate remedy at law because without such declaratory and injunctive relief, Plaintiffs and the Class will continue to endure harm – in the form of overcharging and overpayment of premiums – due to Defendant's conduct.

101. Plaintiffs seek a declaration of the parties' respective rights and duties under the Policy and requests the Court declare the aforementioned conduct of Defendant unlawful and in material breach of the Policy so that future controversies may be avoided.

102. Plaintiffs further seeks an injunction preventing Defendant (1) from continuing to engage in conduct in breach of the Policy in regards to overcharging for premiums, and (2) ordering Defendant to comply with the Policy's terms concerning premium calculations.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated entities, request judgment and relief as follows:

1. For an order certifying the proposed Class, and appointing Plaintiffs and their counsel to represent the proposed Class;

2. For an order awarding Plaintiffs and Class members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

3. For an order awarding Plaintiffs and Class members restitution, disgorgement, rescission, or other equitable relief as the Court deems proper; and

4. For an order awarding Plaintiffs and the Class reasonable attorneys' fees and costs of suit, including expert witness fees.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

DATE: July 27, 2020               Respectfully submitted,

            **BARTLE + MARCUS LLC**

           */s/ David L. Marcus*
Matthew V. Bartle    MO Bar No. 40903
David L. Marcus     MO Bar No. 47846
116 West 47th Street, Suite 200
Kansas City, Missouri 64112
Tel: (816) 256-4614
Fax: (816) 222-0534
mbartle@bmlawkc.com
dmarcus@bmlawkc.com

*Counsel for Plaintiffs and the Class*